<u>**AFFIDAVIT**</u>

I, Michael A. Thrapp, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

<u>**INTRODUCTION AND AGENT BACKROUND**</u>

1.  Your affiant is a sworn police officer with the Aurora Police Department and has been employed as a Detective by the Aurora Police Department (APD) for 35 years with various assignments to include 8 years with the Intelligence Unit with duties of working undercover operations on criminal activity involving gambling, illegal narcotics, and various organized crime investigations.  Your affiant further spent 8 years with Gang Intervention Unit with various duties to include investigations of Criminal Street gangs involved in illegal narcotics, weapons violations, and the violent crimes of assault, robbery and homicide. Your affiant has been assigned as a Task Force Officer (TFO) to the Federal Bureau of Investigation (FBI) Rocky Mountain Safe Streets Task Force (RMSSTF) for over 8 years which investigates violent crimes in the Denver Metropolitan area to include business robberies and other violent crimes.

2.  This affidavit is submitted in support of an application for a search warrant for the place described in Attachment A (hereinafter "Subject Premises,"), and the computer(s) located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1039, Fraud in Connection with Obtaining Confidential Phone Records; and, 18 U.S.C. § 922(d), Selling, Giving or Otherwise Disposing of a Firearm to a Prohibited Person.

1

3. This affidavit is submitted in support of an application for a warrant to search 2700 Stanford Road Apt 20 in Fort Collins, county of Larimer, state of Colorado relating to the investigation of unlawful legal demands submitted to T-Mobile, Sprint, and Verizon Wireless by Matthew Marre and any co-conspirators, which is more fully described in Attachment A, for the evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1039 (Fraud in Connection with Obtaining Confidential Phone Records) and 18 U.S.C. § 922(d) (Selling, Giving or Otherwise Disposing of a Firearm to a Prohibited Person).

4. Your affiant believes Matthew Marre and Ryan Medhurst contacted the law enforcement assistance divisions of Verizon, Sprint, ATT and T-Mobile, and fraudulently claimed to be law enforcement officers in the State of Colorado. Marre claimed he was investigating an emergency that potentially involved death or serious injury for the purpose of obtaining legally protected information without a court of record legal process. Additionally, your affiant believes Medhurst assisted Marre, a convicted felon, in the unlawful possession of firearms.

5. Based on your affiant's training and experience and the facts set forth in this affidavit, your affiant submits that there is probable cause to believe that evidence is located at 2700 Stanford Road Apt 20 in Fort Collins, county of Larimer, state of Colorado as described in this affidavit and further in Attachment A contains such things listed in Attachment B which contain evidence of violations of 18 U.S.C. §§ 1039 and 922(d).

6. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable

cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1039 and 922(d) are presently located at the Subject Premises.

7.  Your affiant has obtained the facts set forth in this affidavit through personal participation in the investigation described below; from oral and written reports of other law enforcement officers participating in this and related investigations; from interviews of sources of information; and from records, documents and other evidence obtained during this investigation.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant to search the listed premises for evidence of violations of 18 U.S.C. §§ 1039 and 922(d) and does not set forth all of your affiant's knowledge about this matter.

## TECHNICAL TERMS

8.  In this affidavit, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

## SEIZURE AND SEARCH OF COMPUTERS

9.  As described above and in Attachment B, your affiant submits that if computers or storage media are found at the Subject Premises**,** there is probable cause to search and seize those items for the reasons stated below.  Some of these electronic records might take the form of files, documents, and other data that is user-generated.  Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.  They may be seized and searched on-scene, and/or searched off-scene in a controlled environment.

10. For example, based on your affiant's knowledge, training, and experience, I know that a powered-on computer maintains volatile data.  Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks (floppy, tape and/or CD-ROM), and printing activity.  Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed.  Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

11. Based on your affiant's knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when

files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

12. Also, again based on your affiant's training and experience, wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, virtual memory "swap" or paging files, and shadow copies of previous versions of systems or files, or paging files. Computer users typically do not erase or delete this evidence because special software is typically required for that task. However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted, edited, moved, or show a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information,

such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

13. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, why they were used, the purpose of their use, and the purposes to which they were put, who used them, the state of mind of the user(s), and when they were used.

14. The monitor and printer are also essential to show the nature and quality of the images or files that the system can produce. In addition, the analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

15. The computer and its storage devices, the mouse, the monitor, keyboard, printer, modem and other system components are also used as instrumentalities of the crime to operate

the computer to commit the offenses discussed in this affidavit. Devices such as modems and routers can contain information about dates, IP addresses, MAC addresses, frequency, and computer(s) used to access the Internet or to otherwise commit the crimes described herein. The computer equipment may also have fingerprints on them indicating the user of the computer and its components.

16. Similarly, information or files related to the crimes described herein are often obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the images, search terms used, exchange, transfer, distribution, possession or origin of the files. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. In this investigation, the subject, Matthew Marre, fraudulently obtained confidential cell phone location data from T-Mobile, Sprint, ATT and Verizon by falsely claiming to be a law enforcement officer. Marre's co-conspirators, including Ryan Medhurst, also assisted Marre by falsely claiming to be law enforcement officers as Marre's supervisor. Further, Marre submitted these requests online to these providers through the use of email and/or

electronic fax.  Once illegally obtaining the cell phone location data, Marre and his co-conspirators utilized a laptop computer to use the data for their own purposes on at least one occasion.  Medhurst also assisted in the transfer of a firearm for Marre, a convicted felon, by filling out paperwork on his Apple laptop computer.

17. "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat,"  instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

18. Your Affiant knows from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address.  Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

19. Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques. For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed. Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use a multitude of techniques, both on and off-scene, including more thorough techniques.

20. Based upon your affiant's knowledge, training and experience, I know that a thorough search for information stored in digital storage media requires a variety of techniques, that often includes both on-site seizure and search as well as a more thorough review off-site review in a controlled environment. This variety of techniques is required, and often agents must seize most or all storage media to be searched on-scene and/or later in a controlled environment. These techniques are often necessary to ensure the accuracy

and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

21. For example, the search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following on-site techniques (the following is a non-exclusive list, as other on-site search procedures may be used):

    a.   On-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

    b.   On-site copying and analysis of volatile memory, which is usually lost if a computer is powered down, and may contain information about how the computer is being used, by whom, when, and may contain information about encryption, virtual machine software (virtual operating systems that are lost if the computer is powered down or encrypted),;

    c.   On-site forensic imaging of any computers may be necessary for computers or devices that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for any examination.

22. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include off-site techniques since it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined off-site and in a controlled environment. This is true because of the following:

a. The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how, when and why a computer has been used, by whom, what it has been used for, requires considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory may be essential to its complete and accurate analysis. Searching for and attempting to recover any deleted, hidden, or encrypted data may be required to determine whether data falls within the list of items to be seized as set forth herein (for example, data that is encrypted and unreadable may not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of child exploitation offenses).

b. The volume of evidence and time required for an examination. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may

try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

c. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

e. Need to review evidence over time and to maintain entirety of evidence. Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. Your affiant has

learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

23. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for permits both on-site seizing, imaging and searching and off-site imaging and searching of storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium,

that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

24.  Because several people may share the Subject Premises as a residence or business, it is possible that the Subject Premises will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

25.  Your Affiant knows from training and experience that search warrants of residences involved in computer or digitally related criminal activity usually produce items that tend to establish ownership or use of digital devices and ownership or use of any Internet service accounts accessed to commit the crimes described in this affidavit to include credit card bills, telephone bills, correspondence and other identification documents.

26. Your Affiant knows from training and experience that search warrants of residences usually reveal items that tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

## **INVESTIGATION**

27. On November 26, 2018 your affiant was on duty at the FBI Rocky Mountain Safe
    Streets Task Force (RMSSTF) as a Task Force Officer (TFO). Your affiant knows
    through his experience in law enforcement that there are four national cell phone carriers
    that provide service to cell phone customers throughout United States to include
    Colorado.

28. Each of the four carriers -- Sprint Corporation, Verizon Wireless, T-Mobile USA, and
    ATT Wireless -- have 24 hour Law Enforcement assistance operators that are available
    to assist in emergencies across the United States to aid any law enforcement agency that
    is involved in an emergency that potentially involves death or serious bodily injury. This
    assistance typically involves assisting law enforcement in locating cell phones that may
    be in the possession of wanted fugitives, suicidal persons, or in assisting with ongoing
    felony investigations, and active crime scenes where further acts of violence could
    occur.

29. Information is provided by these cell phone companies with legal court process
    compelling the companies to assist law enforcement; or, in an emergency, without legal
    process if the situation potentially involves death or serious bodily injury that could
    occur without immediate action.

30. Your affiant received a report of a suspected wire fraud with the victim being Verizon
    Wireless Incorporated where the Law Enforcement Help Center was being exploited.

31. Your affiant contacted Verizon and was advised the following: Since June of 2018 until
    November 2018, five emergency requests for cell phone data were made on the Verizon

Law Enforcement Help Center by a male who identified himself as a Matthew Marre, claiming to be an investigator for the "Colorado Department of Public Safety" and the "Colorado Task Force." Marre used the phone number 970-408-0773.

32. During all five calls Marre was believed to be acting in the capacity of a law enforcement officer requesting immediate release of cell phone information from Verizon Wireless under federal laws 18 U.S.C. 2702 (b) and or 18 U.S.C. 2702 (c) (4). Each time Marre claimed an emergency that potentially involved the danger of death or serious physical harm. Verizon released the requested cell phone records to include GPS location to Matthew Marre.

33. On the fifth call in November of 2018, Verizon employees became suspicious that Marre may not be a law enforcement officer. When Verizon employees called Marre back to verify if he was with a law enforcement agency, they found that the number provided by Marre did not belong to a legal law enforcement agency. Verizon notified the FBI that protected cell phone data to include GPS data was released to a private citizen claiming to be a law enforcement officer.

34. Your affiant researched the phone number used by Marre for these requests, which is 720-354-0721. Publicly available information verifies this number is used by a Matthew Marre.

35. Multiple public sources, as well as law enforcement data bases show Matthew Marre is working as a contractor for at least three Bail Bonds companies to locate and detain persons who have court bonds posted throughout various courts in the state of Colorado. The common or "street" term for this job action is often called a "bail bondsman",

"bounty hunter" and "fugitive recovery agent", all who are private citizens with no law enforcement power under state or federal law. Further, Marre was previously convicted of a felony and is thus ineligible for employment as a law enforcement officer.

36. Your affiant, believing Marre might have been in contact with the other three main national cell phone companies, contacted ATT, T-Mobile and Sprint Wireless law enforcement assistance departments to see if Matthew Marre, using phone numbers 970-408-0773 or 720-354-0721, requested emergency information. T-Mobile and Sprint responded that they had been contacted by Matthew Marre.

**Sprint**

37. In the course of the investigation, Sprint provided two requests made by Marre, dated 11/09/2018 and 11/15/2018. For the request from Marre dated 11/09/2018 (Sprint event #1) the four page document had a generic fax cover sheet to Sprint from Matthew Marre.

38. The second of the four pages was a copy of a cover letter from "COLORADO PUBLIC SAFETY", Fugitive Recovery Division, 308 Mountain View Avenue. Suite B., Johnstown CO 80513, (970)-408-0773 from Investigator Matthew Marre, Matthewmarre@cotf.us (720)-354-0721(cell) and (970)-408-0773 (Main).

39. This second page includes an insignia of a six pointed star badge, with a facsimile of the seal of the State of Colorado in the middle and the words "Colorado Public Safety Fugitive Recovery Agent" in the badge.

40. The third of four pages is a "STORED COMMUNICATION, GPS/PING EMERGENCY REQUEST FORM" which is a Sprint supplied form requiring specific information prior to

releasing data.  Data requested on the form, which is outlined in this affidavit and underlined bold black, was completed by Mathew Marre and returned to Sprint.

**LAW ENFORCEMENT AGENCY (LEA)** "Colorado Public Safety (Task Force)"

**LEA PHONE NUMBER** "(970) 408-0773"

**LEA TITLE** "Investigator"

**LEAE-MAIL (Official, Secure)** **"**Matthewmarre@cotf.us"

The pre filled form then states in italics ***"I hereby certify on behalf of the above mentioned LEA that an emergency involving danger of death or serious physical injury to any person exists and requires disclosure without delay of communications relating to the emergency.***

***Below is my description of the emergency situation, (please indicate the Sprint phone number or other relevant information.)***

The third page has additional questions and responses from Marre.  These include the following:

**SPRINT PHONE NUMBER or CUSTOMER NAME** "9705391527"

**EMERGENCY DESCRIPTION** **"**Subject made suicidal statements to family members and investigator". "Subject has means to carry out threats".

**Request Sprint provide the following service(s) (mark all that apply):**

**Call Detail Records WITH Cell Sites (last 7 days)** An "X" was checked next to box.

**GPS (Location)***                                      An "X" was checked next to box.

41. The last page of Marre's request then has a pre filled statement as follows "All location information assistance will terminate if the valid legal demand or customer consent form is not provided to Sprint within 48 hours. The valid legal process or customer consent should be faxed to 816-600-3100."

    This last page then has a signature line which is signed "Matthew Marre" and dated 11/9/18.

42. The second request to Sprint made by Marre, (Sprint event #2) is dated 11/15/2018.  This second request is similar in most aspects as it again relates to the same target number of "9705391527" and requests call detail records with cell sites for the past 7 days as well as GPS location.

    This second document is signed "Matthew Marre" and dated 11/15/18.

43. ATT reported that they had nine separate phone calls where a person:

    1.  Represented himself to be Investigator Matthew Marre;

    2.  Used the phone number 720-354-0721 to make requests; and,

    3.  Indicated exigent circumstances by claiming the targets of the requests were suicidal.

44.  On 01/10/2018 (ATT event #1) Marre claimed he was working a fugitive case and the fugitive said he was going to kill himself Marre requested "pings" for phone number 970-308-8189.

45. When asked if he was a sworn officer Marre sad, "yes" and gave an email address of matthew.Marre@gmail.com. The ATT operator felt the call was suspicious and upon

consulting with his supervisor Marre was denied data without further verification. Marre

hangs up claiming he will call back.

46. On 03/28/2019 at 49 pm. (ATT event #2) Marre calls and identified himself as a "Special

Investigator with the Colorado Public Safety" and is calling for pings on 202-329-9381.

Marre provides the email address of matthew.marre@cotf.us with a call back number of 970-

408-0773.

47. Marre is provided with GPS coordinates for cell phone 202-329-9381 which places the

phone in Washington D.C.

48. Marre asked if he needs to provide a "exigent form" and is told he did not as ATT no longer

uses the form.

49. On May 31, 2018 (calls #3,#4,#5 event #3) Marre makes three calls in an attempt to get

pings on cell phone number 432-741-1771 because the person was "suicidal" and had a

baby and girlfriend with him. Marre is put on hold and hangs up.

50. Marre case back (call #4 above) and repeats his request for ping information. Marre is again

put on hold and asked for his supervisor information. Marre claims his supervisor can't

come to the phone at this time and is in a meeting. Marre repeats this is a suicidal person

with his wife and child and has the means to carry out the suicide. ATT requires a

supervisor before information given out, call ends.

51.  Call #5 referenced above Marre calls back and Marre explains his supervisor is now

available. Marre is put on hold on the cell phone he is using and the operator calls 970-408-

0773 and a male answers "Task Force". The ATT operator asks if the incident number

Marre had given was a open incident and the male answers "I believe so, is this reference to

one of my agents making a request?" The Att operator stated it is and asked for the supervisors name and is given "Ryan Smith". When asked for his badge number the male answered he is not a sworn officer but a "intelligence analyst" with the agency.

52. When asked by ATT to confirm the incident "Ryan Smith" stated he did not know what Marre was working on but was one of his agents. Ryan stated he is with the "Colorado Public Safety" with an email address of Ryan.Smith@cotf.us. The ATT operator is concerned that Marre is not law enforcement and denies ping data without legal process.

53. On 08/19/2018 at 10:35 p.m.,(calls #6, #7,#8 all are ATT event #4) Marre calls ATT Law Enforcement line 3 times attempting to get ping location data on cell phone number 210-716-5683. Marre claims the investigation into the cell phone is that a person was making suicidal statements to agents.

54. The ATT operator confirms Matthew Marre email address and cell phone number and when no one answered the supervisory number Marre gave he believed Marre is an "imposter caller" and does not release information and advises Marre that they cannot confirm a supervisor at his agency. Marre explains his supervisor bumped the phone but is now available. Marre advises his supervisor is a "Wayne Hays". ATT calls the number given by Marre as his supervisors name and a male answers claiming to be "Wayne Hall" and then changes it to "Wayne Hays". ATT confirms with "Wayne" Marre is on duty and "Wayne" gives his badge number. ATT does not give data at is point and tells Marre they will call him back.

55. Call #7 at 11:50 p.m., (referenced above) Marre calls for an update and ATT stated they are working on his request.

56. Call #8 at 11:51 p.m., (referenced above) Marre again calls for an update and is advised without legal demand (court order) he cannot release ping information.

57. 10/27/2018 (ATT call #9 event #4) Marre calls requesting GPS ping information on cell number 720-296-4988 stating the emergency is "suicidal statements. When asked if Marre was a sworn officer he answers "correct".

58. The ATT operator calls the supervisor number provided by Marre and a male answers claiming to be "Wayne Tyner" and verifies Marre incident number. ATT operator is concerned about the validity of Marre and refuses to give out information.

**Verizon**

59. Verizon reported that they have six separate cases where a person:

   1. Represented himself to be Investigator Matthew Marre;

   2. Used the phone number 720-354-0721 to make requests; and,

   3. Indicated exigent circumstances by claiming the targets of the requests were suicidal.

60. On 06/23/2018 (Verizon event #1) a caller to the Verizon Law Enforcement Help Center claimed to be Marre requested a location service on cell phone number 802-323-9137. A Verizon employee emailed Marre the VERIZON EMERGENCY SITUATION DISCLOSURE form for Marre to fill out for his request.

61. The form stated "UPON receipt of this completed form, Verizon Wireless may divulge records or other information to government entities in certain emergencies, pursuant to 18 U.S.C. 2702 (b) (8) or 2702 (c) (4) or an equivalent state law.

The form continues with, "**Does this request potentially involve the danger of death or serious physical injury to a person, necessitating the immediate release of information relating to that emergency?"** Marre checked the "yes" box and requested location information for the cell phone number of 802-323-9137.

62. Marre stated under "requesting investigative or law enforcement officer" that he was Matthew Marre, an investigator for the Colorado Department of Public Safety, 700 Kipling St, Denver Colorado 80215, with a phone number of 970-408-0773 and email address of Matthew.Marre@COTF.us

The signature line has the oath statement of **"I certify that the foregoing is true and correct and understand that Verizon Wireless may rely on this form to make an emergency disclosure to my law enforcement agency or government entity pursuant to 18 U.S.C. 2702 (b)(8) or 2702 (c)(4)."** This form was signed "Matthew Marre" and dated 06/23/18.

63. Upon receipt of this form, a Verizon Wireless employee released location data to Marre for cell phone number 802-323-9137. On 06/23/2018 at 22:34, Marre called back to Verizon Law Enforcement line requesting an updated location service (GPS) for this number. Verizon provided the updated information to him at 00:25 a.m. on 06/24/2018.

64. On 10/14/2018 (Verizon event #2) Matthew Marre called Verizon Law Enforcement Help Center and requested from employee RM location services (GPS) on cell phone number 970-568-6632.  As with the prior request, Marre checked "yes" indicating the situation potentially involved the danger of death or serious physical injury to a person.

In the pre filled lines stating "***requesting investigative or law enforcement officer***" and ***"Law Enforcement Agency"*** Marre typed name "Inv Marks, PSAP" and an email address of "[Matthew.Marre@COTF.us](Matthew.Marre@COTF.us)".  The signature line stated  **"I certify that the foregoing is true and correct and understand that Verizon Wireless may rely on this form to make an emergency disclosure to my law enforcement agency or government entity pursuant to 18 U.S.C. 2702 (b)(8) or 2702 (c)(4)."** This form was signed "Matthew Marre" and dated 10/14/18.

65. On 10/15/2018 (Verizon event #3) Matthew Marre called the Verizon Law Enforcement Help Center and requested emergency request for location service on 970-673-2072 Marre was emailed an emergency form. However, the form was not returned.  Verizon employee TS was advised that Marre was investigating a suicidal subject and needed location services.  Verizon noted in its call log that information was provided to Marre.

66. On 10/20/2018 (Verizon event #4) Matthew Marre called the Verizon Law Enforcement Help Center and requested locator serviced (GPS) on cell phone 479-659-9352.  Verizon emailed Marre an emergency form.  However, it was not returned.  Verizon employee AT noted in her call logs that Marre claimed the emergency was a suicidal subject.  Marre was provided location services to the number 479-659-9352.  Marre called four more times to

obtain updates on this cell phone location. Verizon notes show that updated data was provided to Marre.

67. On 10/21/2018 (Verizon event #5) Matthew Marre called Verizon Law Enforcement Help Center and requested from Verizon employee RM location services (GPS) on cell phone number 970-673-2072, claiming the person related to the phone number was a suicidal. Note this is the same number he requested on 10/15/2018.

Marre was emailed a **VERIZON EMERGENCY SITUATION DISCLOSURE** form; and, as with prior requests, Marre checked "yes" indicating that the situation potentially involved the danger of death or serious physical injury to a person.

The signature line stated **"I certify that the foregoing is true and correct and understand that Verizon Wireless may rely on this form to make an emergency disclosure to my law enforcement agency or government entity pursuant to 18 U.S.C. 2702 (b)(8) or 2702 (c)(4)."** This form was signed "Matthew Marre" and dated 10/20/18, (not 10/21/2018). Verizon employees provided Matthew Marre Location (GPS) information for the cell phone 970-673-2072 on 10/21/2018 and again on 10/22/2018 when Matthew Marre called back for an update on the location (GPS) of the same cell phone.

68. On 11/18/2018 (Verizon event #6) Matthew Marre called the Verizon Law Enforcement Help Center and requested locator serviced (GPS) on cell phone 208-320-2731. Marre was emailed an emergency form, however it was not returned. Verizon employee AT noted in her call logs that Marre claimed the emergency was a suicidal subject.

69. Verizon employee JF became suspicious that Marre may not be a law enforcement officer. JF called 970-408-0773, which Marre listed as the "main" number for Marre's agency. JF talked to an unknown male who stated that they were not a law enforcement agency.

**T-Mobile**

70. T-Mobile, which corporate office is located at 4 Sylvan Way Parsippany, NJ 07054, indicated they have nine separate cases where a person did the following:

    1. Represented himself to be Investigator Matthew Marre;

    2. Used phone number 720-354-0721 each time he called; and

    3. Represented exigent circumstances claiming in all nine below listed cases the targets of the ping requests were suicidal and had the means to carry out the suicide.

71. Further, all T-Mobile requests were emailed to and from Matthew.Marre@cotf.us; and, all requests contained the same data as detailed below on the T-Mobile/Metro PCS Exigent Form. This form was completed by Mathew Marre and returned to T-Mobile on each of the nine requests. The provided information on the form is as follows:

**Name of Government Entity** Colorado Public Safety-Fugitive Task Force

**Government Entity Street Address** 308 Mountain View Ave Johnstown, CO 80513

**Government Entity Phone** 720-354-0721

**REQUESTING OFFICER/AGENT NAME, TITLE/BADGE OR ID#** Matthew Marre, Investigator (6003)

**OFFICER/AGENT E-MAIL -** Matthew.Marre@cotf.us.

72. All nine forms had the same oath printed that stated in part "**I Understand that I may be held liable for civil and/or criminal penalties either as an individual, as an organization, or both. By signing this form, I certify the information herein is true and correct. Pursuant to 18 U.S.C. 2518, 2702, 3125 and any other applicable Federal or State statute**" and later in the same oath **"This request is made pursuant to 47 U.S.C. 222 (g) , 18 U.S.C. 2702 and 47 C.F.R. 20.18 and subject to state and federal perjury penalties."** All nine forms were dated and signed "Matthew Marre".

73. Below lists the ten numbers requested, the dates of the requests, and the data requested:

1.   Requested 05/28/2018, on 720-410-0610, for Continuous Location (pings every 15 min for 48 hours)

2.   Requested 06/05/2018, on 720-676-5727, for Call retail records with cell sites (last 48 hours).

3.   Requested 07/13/2018, on 720-281-6703, for Continuous Location (pings every 15 min for 48 hours).

4.   Requested 08/26/2018, on 303-842-8350, for Continuous Location (pings every 15 min for 48 hours).

5.   Requested 09/03/2018, on 720-220-1375 and 720-421-8174 for Call retail records with cell sites (last 48 hours) and for Continuous Location (pings every 15 min for 48 hours).  This form had both numbers listed.

6.   Requested 09/15/2018, on 719-896-9907, for Continuous Location (pings every 15 min for 48 hours).

7.   Requested 09/27/2018 on 719-896-9907 and 719-339-1205, for Continuous Location (pings every 15 min for 48 hours)

8.   Requested 10/24/2018 on 1-312-792-6465 for Call retail records with cell sites (last 48 hours) and for Continuous Location (pings every 15 min for 48 hours).

9.  Requested 11/07/2018 on 1-970-347-0670 for Call retail records with cell sites (last 48 hours) and for Continuous Location (pings every 15 min for 48 hours.)

74. Your affiant knows the Colorado Department of Public Safety, which is referenced in this affidavit, is a Division of the state of Colorado Government that has various divisions under it to include law enforcement groups of Colorado State Patrol and the Colorado Bureau of Investigation. The state of Colorado website describes the Colorado Department of Public Safety as follows: "Throughout the state of Colorado, basic public safety services are delivered through local units of government. County sheriffs enforce state laws in Colorado's counties, and local police departments enforce state and local laws within cities. The Colorado Department of Public Safety provides help to sheriffs, police and fire departments, and emergency managers whenever local officials request assistance".

75. Your affiant is familiar with Colorado law regarding law enforcement officers. Matthew Marre is currently unable to apply for and be hired as a law enforcement officer because he has a prior felony conviction.

76. On January 17, 2019 your affiant requested an 18 U.S.C. 2703 (d) court order for the cell phone number of 720-354-0721 which is assigned and maintained by T-Mobile US Inc. This order was reviewed and signed by United States Magistrate Judge Mix and forwarded via the United States Attorney's Office to your affiant, who served the order on T-Mobile US Inc. The order requested toll records of numbers called to and from the target number 720-354-0721 from January 01, 2018 through December 31, 2018.

77. On January 18, 2019 your affiant requested warrant to search account activity, content, and records from T-Mobile regarding emergency law enforcement requests made by Matthew Marre using phone numbers 970-408-0773 and 720-354-0721 and the responses to such

requests for the following phone numbers: (1) 720-410-0610; (2) 720-676-5727 ; (3) 720-281-6703; (4) 720-220-1375; (5) 720-421-8174, (6) 719-896-9907; (7) 719-339-1205; (8) 303-842-8350, (9) 312-792-6465, and (10) 970-347-0670 . This search warrant was reviewed and signed by United States Magistrate Judge Mix on January 18, 2019 (sw-05058 KLM).

78. On January 18, 2019 your affiant received the results of the above described 2703 (d) court order from T-Mobile US Inc. which showed on March 21, 22, and 23 2018, the phone number of 720-354-0721 that was in the care and custody of Matthew Marre called the T-Mobile Law Enforcement line phone number 973-292-8911 twice on March 21, 2018, at 10:53 pm, and 11:27 pm, once on March 22, 2018, at 02:35 am, and once on March 23, 2018 time at 04:26 am.

79. Your affiant requested from T-Mobile US Inc. what the reason for the Marre phone calls on March 21, 22, and 23, 2018, and T-Mobile representatives stated the information requested was protected customer information and advised that they needed a court order to produce the information.

80. Your affiant reviewed law enforcement records and found on March 23, 2018 Matthew Marre contacted the Arapahoe County Sheriff's Department Dispatch Center in Arapahoe County Colorado stating he and his coworker (later identified as Cody Daig) were bondsman and believed the person they were looking to detain on bond violations, was burglarizing a residence in Arapahoe County Colorado.

81. Uniformed Arapahoe County Sheriff Deputy Mackay responded to Marre's location of 7550 South Blackhawk Street in Arapahoe County and Contacted Matthew Marre and Cody Daig.

82. Daig advised Deputy Mackay that he and Marre had a "ping" on their wanted person's cell phone that showed the suspect in the east of the complex.

83. As Sheriff's Deputies were looking for Roberts, Marre and Daig located and handcuffed Roberts in a field and then re-contacted Sheriff's Deputies.

84. During the interview of Marre by Arapahoe Sheriff's deputies, Marre advised he owns "Colorado PSC LLC", and was contracted by "Detail Bail Bonds to recover Christian Roberts" after he (Roberts), failed to show up in court on charges he was on bond for.

85. Marre advised Sheriff's Deputies while looking for Roberts initially found him, and after losing him in a foot chase they (Marre and Daig) went back to their truck and "refresh the suspects GPS location on our laptop."

86. Marre then advised deputies "the new GPS Ping put the suspect on the southeast side of the complex" where Marre and Cody Daig then responded to and located Roberts hiding by bushes.

87. Cody Daig was interviewed by Arapahoe County Sheriff's deputies who advised that he works for "Colorado PSE" as a "bail enforcement" person and on March 23, 2018 he and Marre were looking for Christian Roberts and at a point they observed Roberts momentarily, and then lost sight of him.

88. Marre and Daig returned to their truck, and per Daig, an "updated location ping came in." Daig continues stating "tracking that ping took us to the middle of the field" where Marre and Daig located Roberts.

89. Your affiant believes based on this March 23, 2018 detention of Christian Roberts, both Daig and Marre were working in a conspiracy, to track Roberts by monitoring his cell phone GPS location by having a cell phone provider "pinging" the phone to show the location of the phone at any time. Your affiant knows that this "pinging" of a cell phone can only be done by law enforcement in cooperation with the cell phone carrier that provides service to the specific cell phone.

90. Based on your affiants investigation described in this affidavit he believes the actions and statements of Marre and Daig on March 23, 2018, show the phone calls from Marre cell phone on March 21, 22, and 23, 2018 to the T-Mobile Law Enforcement line are consistent with unlawful acts to obtain information from T-Mobile.

91. Your affiant's prior request for a search warrant for T-Mobile records requested specific information on 10 individual cell phones known to your affiant as being unlawfully compromised by Marre.

92. Your affiant does not know the cell phone number used by Cody Daig or other unknown conspirators who are working with Marre nor does he know the cell phone in the care and custody of Christian Roberts on Marche 23, 2018.

93. Your affiant believes based on the March 23, 2018 events, Cody Daig was aware of and was in contact with a cell phone company "pinging" the phone in the possession of Christian Roberts on March 23, 2018, and that Marre and Daig were "pinging" a T-Mobile phone.

94. On February 08, 2019 your affiant requested a Search warrant for T-Mobile US Inc. for Any and all documents, data and information, including location information, relating to the investigation of unlawful legal demands submitted to T-Mobile by Matthew Marre and any co-conspirators from March 20, 2018 to November 08, 2018. The search warrant was reviewed and approved by United States Magistrate Judge S. Kato Crews and served by your affiant on T-Mobile via email.

95. On February 12, 2019 your affiant received results from this search warrant from T-Mobile. The seven returned results each had an emailed document from Matthew Marre, claiming to a law enforcement officer for the Colorado Public Safety, investigating a suicidal person, and each request needed exigent cell phone pings on seven separate occasions from March 22, 2018 until October 28, 2018.

96. Your affiant, with the assistance of TFO Christopher Pyler of RMSSTF, reviewed one of the cell phones GPS location data provided to Matthew Marre on one of the seven exigent requests.

97. On March 22, 2018, Marre requested from T-Mobile, up to 48 hours of "continuous pings" (GPS location data) for cell phone number 720-645-7646. T-Mobile advised it did supply Marre the requested data on this cell phone.

98. TFO Pyler, using a mapping tool, plotted the latitude and longitude given to Marre, for cell phone number 720-645-7646, and the data showed the cell phone being at a location at or about 7500 S Blackhawk, in Arapahoe County, on March 23, 2018, at the time Christian Roberts, referenced above in this affidavit was detained by Matthew Marre and Cody Daig.

99. Your affiant conducted a preliminary review of the other six cell phone numbers T-Mobile provide to your affiant on February 12, 2019, that had been requested by Marre. It is believed three of the six requested cell numbers are also relevant to persons arrested at or about the time Marre requested exigent GPS data from T-Mobile.

100. On March 27, 2019 your affiant applied for and received a federal court order signed by his honor Scott T. Varholak, Federal Magistrate Judge for the District of Colorado for instillation and use of Precise Location Information and Data/GPS Information on a Cellular Telephone Assigned 720-354-0721. This court order allowed for "ping" data to be submitted by T-Mobile that located Marre cell phone every 15 minutes in real time GPS location services to assist in locating the whereabouts of Marre.

101. On April 01, 2019, your affiant reviewed data from the court approved Precise Location Information and Data/GPS Information on a Cellular Telephone Assigned 720-354-0721. The data showed that Matthew Marre's cell phone was at or near 308 Mountain View Road, in the town of Johnstown, Colorado.

102. On April 01, 2019, FBI Special Agent Joel Nishida went to 308 Mountain View Road Unit B in Johnstown, Colorado for the purpose of obtaining a legal description and observe any activity at this location relevant to the ongoing criminal investigation.

103. Your affiant found that on the fraudulent applications referenced in this affidavit submitted by Marre to "T-Mobile" and "Sprint", Marre claimed his work address was 308 Mountain View "Ave" or "Avenue". SA Nishida took a photo of the street sign for this street which shows "MOUNTAIN VIEW RD."

104. On April 1, 2019 at about 07:15 a.m. SA Nashida observed Matthew Marre's black in color Ford Taurus, Colorado license DDA954 parked in front of 308 Mountain View Road Unit B.

105. DDA954 lists to Colorado PSE LCC. This LLC is listed with the Colorado Secretary of State's Office with Matthew Marre as the registered agent.

106. SA Nishida later watched a white Dodge pull up to 308 Mountain View Road. A white male exited the vehicle and appeared to contact Marre.

107. Shortly after, the white male and Matthew Marre, who was identified by SA Nishida exiting Unit B, got into Marre's black Ford Tarus and drove away from the area.

108. Based on surveillance limitations, SA Nishida was unable to follow Marre's vehicle. Your affiant reviewed Marre's cell phone "ping" data and found that it was located at or near a café at 2842 SE Frontage Road in Johnstown, Colorado.

109. SA Nishida went to the café located at 2842 SE Frontage Road in Johnstown and positively identified Marre in the business. Marre's black Ford was in the parking lot.

110. At about 10:27 a.m., Marre and the unidentified white male exited the café and got into Marre's black Ford and returned to 308 Mountain View Road Unit B and re-entered the business. This was also confirmed by the "pings" your affiant was reviewing on Marre's cell phone.

111. On April 2, 2019, your affiant contacted Beth Ham, senior investigator for the State of Colorado Department of Regulatory Agencies. Ham's duties include investigating compliance of the State of Colorado rules and regulations surrounding Bail Bond

Companies. Ham advised "bail recovery agents" also called "bounty hunters" are not

currently regulated by the State of Colorado.

112.    Ham advised that in her training and experience Bail Bonds companies do collect

information from persons they post bond for in pending criminal matters.  Typically they

collect the arrested person's name, address, phone numbers, names of family and friends, to

include any contact information and other data that could be used to locate the arrested

person if they fail to abide by bond conditions.

113.    Ham stated the information requested by Bail Bond companies is not on a standard state

form, and is often called an "application" to be filled out by the arrested person requesting

bond.

114.    Ham believes the information obtained by the bail bond companies would be transferred

to the "Bail recovery agents" and or "bounty hunters" for locating and detained the person

on the bond.

115.    Your affiant believes that during the above listed March 23, 2018 incident, Marre and his

co-conspirator Cody Daig, illegally obtained information from T-Mobile using Matthew

Marre's cell phone and then received, stored, and plotted the illegally obtained information

on a "Laptop" (common term for laptop computer) in the care and custody of Marre.

116.    Your affiant further believes since January 2018, Matthew Marre obtained requests from

bail bond companies to locate and detain persons wanted for bail bond violations.  Your

affiant believes that  bail bond companies supplied Marre with personal information to

include phone numbers of the wanted person, his family and friends, and that Marre (at least

16 times as referenced in this affidavit) used phone numbers related to persons in default of their bond conditions to illegally obtain data from Verizon, Sprint and T-Mobile.

117. On 04/02/2019 your affiant obtained a search warrant for 308 Mountain View Road Unit B, in the city of Johnstown, county of Weld, state of Colorado. On 04/02/2019 an arrest warrant was issued by the US Federal Court for the arrest of Matthew Marre on the charges of 18 U.S.C. § 1039 (Fraud in Connection with Obtaining Confidential Phone Records).

118. On 04/04/2019 members of the Denver FBI SWAT team and FBI RMSSTF executed the search warrant at 308 Mountain View Road Unit B and arrested Matthew Marre in the business.

119. A cell phone was found by Matthew Marre and pursuant to the search warrant it was seized and later reviewed by law enforcement. The cell phone used a cell phone number of 720-354-0721 which was in the care and custody of Matthew Marre and the principle phone identified as being used by Matthew Marre.

120. On 04/08/2019 your affiant conducted a proffer with Cody Daig and his attorney regarding the investigation. Daig said he has known Matthew Marre and Ryan Medhurst since around 2015. Daig further explained that he has known Wayne Tyner for under a year.

121. Daig knows Marre is employed in the bail bond recovery business. Daig said that he, Wayne Tyner and Ryan Medhurst have assisted Marre in bail bond recovery.

122. Daig and Marre have a business relationship regarding Marre's bail bond recovery. Daig advised Marre was not good with organization so he began doing Marre's "billing" to the bail bond companies.

123.  Daig knows Marre has possessed weapons within the past several years. Daig stated he has been in the basement of Ryan Medhurst's house which is in a fourplex in Fort Collins. Daig explained that Marre advised Daig that he has a "trust" with Medhurst in which Medhurst will hold Marre's weapons for him until Marre can legally possess weapons again. Daig estimated Marre owns two handguns, two assault rifles (Daig is positive one rifle is an AR-15) and one shotgun. Daig stated in the basement both Marre and Medhurst "show off" their gun collections.  Daig has observed Marre and Medhurst handling these weapons at least five times in 2018.

124.  Daig has heard Marre tell people that he "pings" cell phones, including Christopher Glenn, Medhurst and Tyner.

125.  Daig conceded he developed the "COTF.US" website that Marre used to obtain phone records and phone "pings".  Daig does not know how many (if any) other persons have accounts using that email address. Daig confirmed the email of Matthew.Marre@cotf.us as the email address he set up for Marre.

126.  Daig was shown the T-Mobile law enforcement form that was used on the phone pings for March 23, 2018 detention of Christian Roberts. On the form where it put Marre's supervisor as "Ryan Johnson", Daig stated he did not know that person. However, Daig believes Ryan Medhurst would vouch for Marre as being law enforcement. Daig confirmed that he was with Marre on the March 23, 2018 arrest of Christian Roberts (Daig recalled the event but not the name of Roberts) and acknowledged that Marre and Daig used cell phone pings to locate Roberts. Daig stated that while looking for Roberts, Marre never stated that Roberts was suicidal.

127. On 04/22/2019 a follow up proffer was conducted with Cody Daig. Daig listened to the ATT phone call listed in this investigation as ATT call #5, May 31, 2018, 6:33 P.M. Daig stated he is positive the voices heard of a person claiming to be Matthew Marre is Matthew Marre; and, the voice of the person claiming to be "Ryan Smith" is positively Ryan Medhurst.

128. Daig listened to the ATT phone call listed in this investigation as ATT call #6. Daig is 90% sure the voice of Wayne Tyner is the same voice of the person claiming to be Marre's law enforcement supervisor "Wayne Hays". Daig was played the ATT phone call listed in this investigation as ATT call #9 October 27, 2018 at 4:43 p.m., with a voice claiming to be law enforcement supervisor "Wayne Tyner". Daig is 90% sure this is the voice of Wayne Tyner. Because Daig is not commonly on the phone with Tyner he could not be 100% sure.

129. Daig stated that he recalled that several years ago (estimated in 2016) Marre and Daig were going to help a horse trainer kill several coyotes who were bothering farm animals.

130. Daig stated he and Marre went to Ryan Medhurst's basement and that Marre and Medhurst removed two AR-15 rifles and ammunition from Medhurst's gun safe. Marre took an AR-15 Daig believed belonged to Marre. Daig was handed an AR-15. The then drove to the "Lucky Star Equine" Training Center off "392 and I-25" and they shot one coyote each with their respective rifles.

131. On 04/24/2019 your affiant conducted an interview with Christopher Glenn regarding his association with Matthew Marre and Ryan Medhurst. Glenn stated he has talked to Ryan Medhurst on a regular basis and they are close friends. Medhurst has been advising Glenn what is going on with Marre.

132.   Glenn was asked if he had seen Marre in Medhurst's basement holding firearms and Glenn stated yes he had. When Glenn was asked if he knew Marre was a "convicted felon" Glenn stated yes he did.

133.   Glenn listened to the ATT phone call listed in this investigation as ATT call #5, May 31, 2018, 6:33 P.M. Glenn stated he is positive the voices heard of a person claiming to be Matthew Marre is Matthew Marre and the voice of the person claiming to be law enforcement supervisor "Ryan Smith" is positively Ryan Medhurst.

134.   Your affiant asked Glenn his knowledge of Marre getting phone pings and he stated he did hear Marre talk of receiving phone pings in relation to finding persons on bail.

135.   On April 26, 2019 your affiant conducted a proffer with Wayne Tyner and his attorney. Tyner confirmed he knew Cody Daig, Matthew Marre and Ryan Medhurst. Tyner confirmed he was with Marre on several arrests of persons on bail where phone pings were used in part to locate and arrest persons.

136.   Tyner was asked about the September 16, 2018 arrest of Jamie Cardona in Colorado Springs which is referenced in this affidavit. Tyner was shown a photo of Cardona which he did not recognize. However Tyner recalls the event and remembers using a Taser on Cardona.

137.   Tyner stated Marre did use phone pings as well as a local informant to locate Cardona. Tyner stated at no time did Marre advise him that Cardona was suicidal or had claimed he wanted to commit suicide.

138.    Tyner was then asked about the arrest of Matthew Jaramillo in Wyoming in October of

2018. Tyner recalls the arrest and stated he and Matthew Marre had placed a GPS device on

the vehicle of Jaramillo before it went to Wyoming in hopes of locating Jaramillo.

139.    Tyner stated that Marre used cell phone pings and the GPS to locate Jaramillo in

Wyoming and then he and Marre transported Jaramillo back to the Weld County jail. Tyner

stated at no time did Marre advise Jaramillo had claimed or had attempted suicide. Tyner

listened to the ATT phone call listed in this investigation as ATT call #5, May 31, 2018,

6:33 P.M.

140.    Tyner stated he is positive the voices heard of a person claiming to be Matthew Marre is

of Matthew Marre, and the voice of the person claiming to be law enforcement supervisor

"Ryan Smith" is positively Ryan Medhurst.

141.    Tyner was played the ATT phone call listed in this investigation as ATT call #6 and the

voice of the person claiming to be "Wayne Hays". Tyner confirmed that was his voice and

that he, at the request of Matthew Mare, deceived ATT by pretending to be Marre's law

enforcement supervisor so Marre could obtain cell phone pings.

142.    Tyner was played the ATT phone call listed in this investigation as ATT call #9 October

27, 2018 at 4:43 p.m., with a voice claiming to be "Wayne Tyner", Tyner confirmed again it

was his voice and that he was attempting to deceive ATT law enforcement line into

believing that he was Marre's supervisor.

143.    Tyner was asked about Matthew Marre and weapons. Tyner repeated what he had stated

on 04/04/2019 in an interview with FBI Special Agent Philip Jones in that he recalled Marre

possessed a handgun during the time Tyner rode with Marre in locating fugitives during 2018.

144.    Tyner stated Marre is a gun enthusiast and keeps his guns at Ryan Medhurst's house in Fort Collins. Tyner stated sometime between Thanksgiving 2018 and January 2019 Marre gave Tyner a new Glock 17 handgun as a gift.

145.    Tyner recalls being asked by Marre to go to Medhurst's house in Fort Collins. Medhurst was not home but Marre had a house key and let them both in. Inside the basement of the house, Mare opened one of the two gun safes in the house.  They first looked at an AR-15 with a camouflaged barrel that Marre claimed he owned. Marre reached into the safe and pulled out a Glock 17 box and stated to Tyner that he [Marre] was giving the weapon to Tyner as a Christmas gift. Tyner stated the weapon appeared new as it still had the metallic lubricant on the slide of the weapon that is consistent with a new Glock firearm. Tyner stated Marre told him he was getting the weapon because he was the most dedicated person who was helping Marre arrest persons for bail violations.

146.    Tyner and Marre then went to the Longmont Emergency Unit and met up with Ryan Medhurst.  Medhurst who opened up his (Medhurst' s) Apple computer and electronically filled out the paperwork Tyner believed was for transferring the Glock 17 to his possession.

147.    Tyner knows that Medhurst has a federal firearms license. Tyner stated he answered questions from Medhurst that were consistent with the federal paperwork to purchase a firearm. Tyner paid Medhurst for a criminal history check for the firearm and for the background check needed for joining the Longmont Emergency Unit. Tyner stated he never paid Marre or Medhurst for the weapon and considers it a gift from Marre for Christmas.

Sometime after receiving the weapon, Marre and Tyner went to a gun range together where Tyner fired the Glock 17 and Marre fired his AR-15.

148.  Your affiant reviewed the text messages from the cell phone of Matthew Marre that was recovered on 04/04/2019 pursuant to a search warrant signed by United States Magistrate Kristen Mix.  For purposes of clarity, when noted below in the affidavit "MARRE cell phone," the information relates to cell phone number 720-354-0721 that has been referenced in this affidavit and was in the care and custody of Matthew Marre in 2018 and 2019 until his arrest on 04/04/2019. When noted "MEDHURST cell phone" the information relates to the cell phone number of 970-302-8775 that is in the care and custody of Ryan Medhurst. When noted "DANIELLE cell phone" the information relates to the cell phone of 720-209-5142 that is used by Danielle Tyner, wife of Wayne Tyner referenced in this affidavit. Upon review of the MARRE cell phone, your affiant searched the word "Glock" and received several responses to include the following:

- On 11/12/2018 at 11:52 p.m., from MARRE cell phone to MEDHURST cell phone,
  - "**Glock 17 reminder**".
- On 11/12/2018 at 11:55 p.m., from MEDHURST cell phone to MARRE cell phone,
  - "**These look right**?".
- On 11/12/2018 at 11:55 p.m., from MEDHURST cell phone to MARRE phone cell phone is a photo of Glock pricing list of various Glock handguns to include a Glock 17 priced at $425 dollars.

- On 11/12/2018 at 11:56 p.m. from MARRE cell phone to MEDHURST cell phone,

  - "**<u>YES</u>**".

- On 11/13/2019 at 10:50 a.m. from MEDHURST cell phone to MARRE cell phone,

  - "**Do you want GEN 4 or 5? Night sights?**".

- On 11/13/2018 at 2:06 p.m. from MEDHURST cell phone to MARRE cell phone,

  - "**Ordered**".

- On 11/14/2018 at 12:30 p.m. from MEDHURST cell phone to MARRE cell phone,

  - "**Ill get the Glock on thurs**".

- On 11/14/2018 at 12:30 p.m. from MARRE cell phone to MEDHURST cell phone,

  - "**OK**".

- On 11/17/2018 at 8:56 p.m. from MARRE cell phone to DANNI cell phone,

  - "**Im so tempted to just give him his Glock….LOL**".

- On 11/17/2018 at 8:57 p.m., from DANIELLE cell phone to MARRE cell phone,

  - "**Did he pass the background check**".

- On 11/17/2019 at 8:57 p.m., MARRE cell phone to DANIELLE cell phone,

  - "**Yes"**.

- On 11/17/2018 at 901 p.m., from MARRE cell phone to MEDHURST cell phone,

  - "**Im just tempered (sic) to just give it to him, I cant find puzzle**".

- On 11/17/2018 at 9:02 p.m. from MEDHURST cell phone to MARRE cell phone,

  - "**Lol ok**".

- On 11/17/2018 at 9:02 p.m. from MEDHURST cell phone to MARRE cell phone,

  - "**Do it tonight**?"

- On 11/17/2018 at 9:03 p.m. from MARRE cell phone to MEDHURST cell phone,

  o "**Thinking about it**".

- On 11/17/2018 at 9:09 p.m., from MARRE cell phone to MEDHURST cell phone,

  o "**Is it on the safe**".

- On 11/17/2018 at 9:09 p.m., from MARRE cell phone to MEDHURST cell phone,

  o "**In the**".

- On 11/17/2018 at 9:09 p.m., from MEDHURST cell phone to MARRE cell phone,

  o "**No**".

- On 11/17/2018 at 9:09 p.m. from MARRE cell phone to MEDHURST cell phone,

  o "**Where is it**".

- On 11/17/2018 at 9:10 p.m., from MEDHURST cell phone to MARRE cell phone,

  o "**in the glass cabinet by laundry room**".

- On 11/17/2018 at 10:15 p.m., from DANIELLE cell phone to MARRE cell phone.

  o "**He was definitely shocked when you handed the Glock to him. I heard it in his voice. He was totally off guard. Lol**."

149. On 05/01/2019 your affiant contacted Jason C. Clemens, investigator for the Bureau of Alcohol, Tobacco, Firearms & Explosives, assigned to the Denver Crime Gun Intelligence Center and works on compliance issues with persons who possess Federal Firearms licenses. Clemens reviewed the federal firearms license of Ryan Medhurst who identified his home address as 2700 Stanford #20, Fort Collins. Medhurst claimed his business name and address for selling firearms is BOFH Enterprises which Medhurst listed as licensed at 308

Mountain View Drive Unit B, Berthoud.  He also has a mailing address for the business as

6493 Thompson Drive, Fort Collins. (Your affiant informs the court for purposes of clarity

308 Mountain View Drive as referenced in this affidavit is in the city limits of Johnstown

however has a city of Berthoud mailing address.)   Clements advised federal firearms

licensees are required to keep two sets of records, ATF Forms 4473 and Acquisition and

Disposition records (per Clements often referred to as an "A&D Book"). The Form 4473

shows the transfer of a firearm to a non-licensed firearms person.  The A&D book shows

where the firearm came in from and where it went to.  The records are required to be kept at

the business premise.

150.    Your affiant contacted Kenneth Klopp, the owner of the property at 308 Mountain View

in Johnstown Colorado. Klopp was aware of the FBI search warrant on April 4, 2019 at

Marre's business address of 308 Mountain View unit B.  Klopp stated since the search

warrant he has been inside unit B on a regular basis as Klopp has stored some personal

items in the unit. Also, Klopp stated that although Ryan Medhurst comes occasionally to

Unit B, Medhurst is not conducting business at the address.

151.    Tyner provided the serial number of the Glock handgun given to him by Mathew

Marre.  The serial number was BFMW370.  Your affiant asked ATF Clemens to search

ATF data bases to attempt to find information on the purchasing or selling of this weapon.

Clemens conducted a "Firearms Trace Summary" of serial number BFMW370 and found

that it shows attached to a Glock 17 Generation 4, 9 mm handgun that was purchased by

Wayne Tyner (referenced in this affidavit) on 11/17/2018 from BOFM  Enterprises located

at 308 Mountain View Drive Unit B in Berthoud CO with a phone number of 970-833-1293.

In addition the form shows under the DEALER INFORMATION" the notation "ship to date 11/13/2018".

152.  Based on the statements of Wayne Tyner, Cody Daig and Cristopher Glenn, along with text messages recovered from the cell phone of Matthew Marre from 11/13/2018 through 11/17/2018, your affiant believes Matthew Marre unlawfully possessed firearms in 2018. In addition, Marre unlawfully kept firearms in his custody and control at Ryan Medhurst's house in Fort Collins.  Your affiant further believes that Marre and Medhurst conspired to circumvent federal firearms laws in the purchase and delivery of a Glock 17 by Matthew Marre using Ryan Medhurst as a licensed federal firearms dealer. Medhurst received the weapon and allowed it to be obtained by Matthew Marre, a convicted felon and prohibited person. Marre then physically handed the weapon to Wayne Tyner at 2700 Stanford Road Apt 20 in Fort Collins, Larimer County, Colorado for services rendered in the bail recovery business.

153.  Medhurst then filled out federal firearms paperwork that fraudulently claimed the weapon was purchase by Tyner omitting any involvement of Matthew Marre in the purchasing or delivery of the weapon to Tyner.

154.  Your affiant believes the illegally obtained information and related documents are stored in the home of Ryan Medhurst in both paper and electronic data formats, under the care and custody of Ryan Medhurst and is located 2700 Stanford Road Apt 20 in Fort Collins, Colorado. Your affiant further believes weapons belonging unlawfully to Marre as well as fraudulent associated documents are the location as well.

155. On 05/07/2019 FBI Agent Philip Jones responded to 2700 Stanford Road unit #20 in Fort Collins Colorado and described it as single story duplex with a red brick construction and white in color trim with a front door and two car garage that faces west and to the right of the front door is in gold color the numbers "20".

156. Thus your affiant requests a search warrant for 2700 Stanford Road unit #20 in Fort Collins. to obtain the following:

a. All cell phones both active and inactive that could have been used by Ryan Medhurst using cell phone number 970-302-8775,

b. All computers that can be used to store, receive or submit information to Sprint, T-Mobile and or Verizon as referenced in this affidavit.

c. Paperwork, logos, business cards, identification documents that identify Matthew Marre, Cody Daig, Ryan Medhurst and/or other persons as law enforcement officers or preforming law enforcement activity.

d. Bills, receipts, logs, reports, printed email, spreadsheets and other business documents, in any form electronic or otherwise, that relate to purchase, sale and distribution of firearms and including the business of BOFH Enterprises, which is under the care and control of Ryan Medhurst.

e. Firearms belonging to Matthew Marre.

///

///

## **CONCLUSION**

157.   Based on the investigation described above, probable cause exists to believe that at the business located at the place described in Attachment A, will be found evidence, fruits, and instrumentalities of a violation of 18 U.S.C. § 1039, Fraud in Connection with Obtaining Confidential Phone Records; and, 18 U.S.C. § 922(d), Selling, Giving or Otherwise Disposing of a Firearm to a Prohibited Person.

158.   I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

*s/Michael Thrapp*
MICHAEL THRAPP
TASK FORCE OFFICER
FBI (Denver) Safe Streets Task Force

Sworn to before me this 15th day of May, 2019.

_____
United States Magistrate Judge

Application for search warrant was reviewed and is submitted by Greg Holloway, Assistant United States Attorney